UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DONNA SCHULD, | ) |
| Plaintiff, | ) Case No. 21-cv-1807 |
| v. | ) Hon. Steven C. Seeger |
| PEGGY THODOS and JOHN THODOS, | ) |
| Defendants, | ) |
| DANIEL SCHULD, | ) |
| Intervenor. | ) |
| DANIEL SCHULD, | ) |
| Third-Party Plaintiff, | ) |
| v. | ) |
| PEGGY THODOS and JOHN THODOS, | ) |
| Third-Party Defendants, | ) |

**MEMORANDUM OPINION AND ORDER**

This case involves an intra-family dispute about who should receive the proceeds of a promissory note. Richard and Donna Schuld loaned millions of dollars to Richard's daughter Peggy Thodos and her husband John Thodos to buy real estate in Florida. But they didn't pay back the loan. And then, Richard Schuld died.

Donna Schuld eventually filed this lawsuit against her stepdaughter (Peggy) and her son-in-law (John) to collect on the promissory note. At that point, Daniel Schuld – the son of

Richard, the stepson of Donna, and the brother of Peggy – entered the scene, and entered the case. He intervened as of right in his capacity as the executor and trustee of Richard's estate. He asserts rights to the proceeds of the promissory note, too. He's competing with his stepmother for the funds.

The appearance of Daniel did more than complicate a family feud. It created reasons to doubt whether this Court has diversity jurisdiction. Daniel Schuld (as the executor) is a citizen wherever Richard Schuld (the decedent) was domiciled. If Richard was domiciled in Illinois, then there is no diversity jurisdiction, because Daniel (the son) and Donna (the stepmother) are adverse. But if Richard was domiciled in Florida, then there is complete diversity.

Peggy and John Thodos moved to dismiss for lack of subject matter jurisdiction. For the reasons stated below, the motion is granted.

**Background**

When addressing a motion to dismiss for lack of subject matter jurisdiction, the Court must "accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the [non-moving party]." *See St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 625 (7th Cir. 2007). That said, the Court does not need to accept the plaintiff's factual allegations if defendant brings a *factual* challenge to the complaint, arguing that there is *in fact* no subject matter jurisdiction. *See Apex Digit., Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009).

More on that standard later. For now, to tell the background story, the Court accepts the facts in the complaint that *don't* relate to Richard Schuld's domicile in the fall of 2018.

In early 2018, Plaintiff Donna Schuld and her late husband, Richard Schuld, resided in Illinois. *See* Am. Cplt., at ¶ 115 (Dckt. No. 10). Defendant Peggy Thodos is the daughter of

Richard, and the stepdaughter of Donna. Peggy is domiciled in Florida with her husband, Defendant John Thodos. *Id.* at ¶¶ 6–7, 16. So a stepmother (Donna) is suing her stepdaughter (Peggy) and her son-in-law (John).

Peggy and John Thodos are the only two members of Defendant SDE1, LLC. *Id.* at ¶ 8. As a result, SDE1 is a citizen of Florida based on the citizenships of its members. *Id.* at ¶ 9; *see also Thomas v. Guardsmark, LLC*, 487 F.3d 531, 534 (7th Cir. 2007).

In March 2018, Peggy and John Thodos wanted to purchase a home in Naples, Florida. *See* Am. Cplt., at ¶ 18 (Dckt. No. 10). They started the process of acquiring the property. They signed a contract and made an earnest money payment of $800,000. *Id.* at ¶ 20.

The couple sought financing for the property with Wells Fargo Advisors in Illinois, but they were unsuccessful. *Id.* at ¶ 21. They struck out when looking elsewhere for financing, too. *Id.* at ¶ 22. The denial of financing left them exposed. They needed to borrow money to close the deal, and if they couldn't close, then the seller would keep the earnest money deposit – meaning all $800,000. *Id.* at ¶ 23.

So Peggy and John Thodos asked Richard and Donna for a loan to help them buy the Naples property. *Id.* at ¶ 24. They explained that if they didn't get the loan, they would lose $800,000. *Id.* at ¶ 25. And they assured Richard and Donna that they could pay it back within two to four weeks. *Id.* at ¶ 26.

Richard and Donna agreed to lend a hand (and their wallet). The older couple (Richard was in his mid-eighties at the time) orally agreed to loan $5.3 million, on the condition that Peggy and John would repay them in two to four weeks. *Id.* at ¶ 27.

In April 2018, Richard and Donna opened a "Priority Credit Line" with Wells Fargo, as joint tenants, and sent a $5.3 million wire transfer to Defendants for the purchase of the Naples

3

residence. *Id.* at ¶¶ 28, 30. Defendants received the funds and purchased the property. *Id.* at ¶ 32. Defendant SDE1 took title to the home. *Id.* at ¶ 33.

The purchase of the Naples property went smoothly, but the repayment of the loan did not. Peggy and John Thodos refused Richard and Donna's repeated requests to repay the loan. *Id.* at ¶¶ 34–35. And they refused to get a commercial loan to repay the $5.3 million in September 2018, citing the high interest rate. *Id.* at ¶ 36.

By September 2018, Richard had enough. He asked Defendants to sign a note promising to pay back the loan. *Id.* at ¶ 37. Peggy and John Thodos agreed and signed the note, promising to repay the $5.3 million to Richard and Donna. *Id.* at ¶¶ 38–40; *see* Promissory Note (Dckt. No. 10, at 22–23 of 23).

Sadly, Richard passed away on December 25, 2018. *See* Am. Cplt., at ¶ 43 (Dckt. No. 10). At the time of his death, Defendants had not repaid anything. *Id.* at ¶ 44.

Two years passed, and Peggy and John did not repay any part of the $5.3 million loan. *Id.* at ¶ 46. That lack of repayment was not for lack of opportunities. In October 2020, Defendants sold a separate property in Naples for $5.8 million. *Id.* at ¶ 45. Despite the sale, Defendants didn't use any proceeds to repay the loan. *Id.* at ¶¶ 45–46.

In April 2021, Donna Schuld brought this lawsuit against Peggy Thodos (her stepdaughter) and John Thodos (her son-in-law). *See* Cplt. (Dckt. No. 1). And in response to this Court's Order, she filed an amended complaint with a more detailed jurisdictional statement. *See* Am. Cplt. (Dckt. No. 10); *see also* 4/8/21 Order (Dckt. No. 8).

Donna Schuld brings five claims against Peggy and John Thodos, including fraud, unjust enrichment, breach of contract, and violations of the Illinois Commercial Code.

All the while, another family member believed that he had an interest in the repayment of the loan. In June 2021, Daniel Schuld moved to intervene. *See* Mtn. to Intervene (Dckt. No. 17). He is the son of Richard, the stepson of Donna, and the brother of Peggy Thodos.

Daniel moved to intervene as of right under Rule 24(a)(2). *See* Fed. R. Civ. P. 24(a)(2). He moved to intervene in his capacity as the executor of the Estate of Richard Schuld and the trustee of the Richard P. Schuld Revocable Living Trust. *See* Mtn. to Intervene (Dckt. No. 17).

In his motion, Daniel Schuld argued that Donna Schuld (again, his stepmom) does not have exclusive right to the $5.3 million note. *Id.* at ¶ 11. Instead, any amount paid by Defendants must go to paying off a collateralized account held by the Trust. *Id.* at ¶¶ 7, 11. So, according to Daniel, he has "an interest relating to the property or transaction that is the subject of the action," and "is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest." *Id.* at ¶ 16 (citing Fed. R. Civ. P. 24(a)(2)).

The Court granted Daniel Schuld's motion to intervene by right. *See* 6/22/21 Order (Dckt. No. 18). The Court allowed Daniel Schuld to file an intervening complaint, and he did so two days later. *Id.*; *see also* Third-Party Cplt. (Dckt. No. 19). The third-party complaint brings similar claims as Donna's amended complaint, including claims for common law fraud, unjust enrichment, breach of contract, and violations of the Illinois Commercial Code.

In response to Daniel Schuld's intervention, Peggy and John Thodos filed a motion to dismiss the case for lack of subject matter jurisdiction. *See* Defs.' Mtn. to Dismiss (Dckt. No. 24). In their view, the arrival of Daniel Schuld destroyed complete diversity.

## Legal Standard

The motion at hand involves a factual challenge to subject matter jurisdiction. Defendants offer evidence to show that the parties are not diverse, and that the Court lacks

diversity jurisdiction under 28 U.S.C. § 1332. *See Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015) (noting that a factual challenge occurs when a party contends there is in fact no subject matter jurisdiction, even if the pleadings allege a basis for jurisdiction).

In reviewing a factual challenge to jurisdiction, the Court may evaluate "whatever evidence has been submitted" on the issue. *See Apex Digit.*, 572 F.3d at 444; *see also Silha*, 807 F.3d at 173 (noting that a court "may look beyond the pleadings and view any evidence submitted" when reviewing a factual challenge); *Reid L. v. Illinois State Bd. of Educ.*, 358 F.3d 511, 515 (7th Cir. 2004) (explaining that the court may "find the facts" in a factual challenge). Where the parties have a dispute about jurisdictional facts, "no presumptive truthfulness attaches to [the] plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Apex Digit.*, 572 F.3d at 444 (quotation marks omitted).

## Analysis

District courts have diversity jurisdiction over all actions "where the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between . . . citizens of a State and citizens . . . of a foreign state . . . ." *See* 28 U.S.C. § 1332(a). "Diversity jurisdiction's basic rationale . . . is opening the federal courts' doors to those who might otherwise suffer from local prejudice against out-of-state parties." *Hertz v. Friend*, 559 U.S. 77, 85 (2010); *see also Home Depot U.S.A., Inc. v. Jackson*, 139 S. Ct. 1743, 1746 (2019).

"For well over 200 years, the Supreme Court has interpreted statutory diversity jurisdiction to require 'complete diversity' between the parties." *Page v. Democratic Nat'l Comm.*, 2 F.4th 630, 636 (7th Cir. 2021) (citing *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 267 (1806)). In other words, a plaintiff and a defendant cannot be citizens of the same state.

Apart from class actions, "shared citizenship between just one party on both sides of the lawsuit destroys complete diversity." *Id.*

Peggy and John Thodos argue that Daniel Schuld's intervention destroys complete diversity. Defendants rely on three propositions. First, Daniel Schuld is an indispensable party, and therefore his citizenship counts for jurisdictional purposes. Second, Donna Schuld and Daniel Schuld have adverse interests, meaning that Daniel Schuld is effectively a defendant in Donna Schuld's claim. Third, Richard Schuld was domiciled in Illinois at the time of his death, so therefore Daniel Schuld (in his capacity as the executor/trustee) is a citizen of Illinois too. *See* Defs.' Mtn. to Dismiss, at ¶ 16 (Dckt. No. 24).

The first issue is uncontested. Everyone agrees that Daniel Schuld is an indispensable party. The second issue isn't much of an issue, either. The parties agree that Donna Schuld and Daniel Schuld have adverse interests because they assert competing rights to the same asset. But the last issue is hotly contested. All of the action revolves around where Richard Schuld was a citizen at the time of his death.

If Richard Schuld was a citizen of Illinois, then there is no diversity, because Donna Schuld is a citizen of Illinois. But if Richard Schuld was a citizen of Florida, then there is diversity, because Richard and Donna (and by extension, Daniel as the executor/trustee) would be citizens of different states.

This Court will address all three points. The punchline is that Richard Schuld was a citizen of Illinois at the time of his death. So Daniel Schuld is a citizen of Illinois in his capacity as executor/trustee. He is adverse to his stepmother Donna Schuld, who is a citizen of Illinois. So there is no diversity of citizenship.

I. **Indispensable Party**

This Court previously granted Daniel Schuld's motion to intervene as of right. *See* 6/22/21 Order (Dckt. 18). He is an indispensable party, so his citizenship counts for purposes of diversity jurisdiction.

As a general matter, "whether federal diversity of citizenship jurisdiction exists is determined by examining the citizenship of the parties at the time the action is commenced by filing the complaint with the court as prescribed by Federal Rule of Civil Procedure 3." *See* 13E Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3608 (3d ed. 2021); *see also Aurora Loan Servs., Inc. v. Craddieth*, 442 F.3d 1018, 1025 (7th Cir. 2006) ("[F]ederal jurisdiction is (with immaterial exceptions) determined as of the date the complaint is filed."). So, ordinarily, what matters is the diversity of parties at the *beginning* of a lawsuit, not what happens later.

An exception applies when an intervening party is "indispensable" to the litigation. *See Costain Coal Holdings, Inc. v. Res. Inv. Corp.*, 15 F.3d 733, 734 (7th Cir. 1994) ("A pertinent exception to the rule that there must be complete diversity is that if the non-diverse party comes into the case by intervening in it, his presence will not deprive the court of jurisdiction *unless the intervenor was an indispensable party when the complaint was filed*.") (emphasis in original) (cleaned up); *In re Brand Name Prescription Drugs Antitrust Litig.*, 1996 WL 732834, at *4 (N.D. Ill. 1996) ("The law is clear that a non-diverse intervenor's presence in a case will not destroy diversity unless the intervenor 'was an indispensable party at the time the case was filed.'") (citing *Costain*, 15 F.3d at 734); *Cargo Pac. Logistics, Inc. v. Concord Exp., Inc.*, 1996 WL 699649, at *5 (N.D. Ill. 1996); *see also Hassebrock v. Bernhoft*, 2013 WL 4008899, at *3

(S.D. Ill. 2013) ("[D]iversity jurisdiction may be lost when new parties are added to a case, if they were indispensable when the original complaint was filed.").

Defendants argue that Daniel Schuld is an indispensable party to Donna Schuld's suit for four reasons: (1) a judgment rendered in his absence could prejudice his interests; (2) the Court could not tailor its judgment to avoid prejudicing his interests; (3) the Court's judgment would be inadequate without his participation; and (4) he would lack an adequate remedy if the action was dismissed. *See* Defs.' Mtn. to Dismiss, at ¶ 19 (Dckt. No. 24).

Everyone agrees that Daniel Schuld is an indispensable party. *See* Third-Party Intervenor's Resp. to Defs.' Mtn. to Dismiss (Dckt. No. 40); Pl.'s Resp. to Defs.' Mtn. to Dismiss (Dckt. No. 44). The Court agrees that Daniel Schuld has a sufficiently close connection with Donna Schuld's case to constitute an indispensable party.[1] His interests are at stake, and he could lose out if he doesn't participate.

The Court therefore considers Daniel Schuld's citizenship, in his capacity as the executor/trustee, in determining diversity.

## II. Alignment of Interests

The next question is whether the Court should consider Daniel Schuld as a plaintiff or a defendant. That is, the question is which side of the "v." Daniel Schuld is on.

When parties bring a claim based on diversity of citizenship, "the Court may ascertain whether the alignment of plaintiff and defendant 'conforms with their true interest in litigation.'" *See Brandl v. Westport Ins. Corp.*, 2019 WL 10784421, at *1 (N.D. Ill. 2019) (citing *Am.*

---

[1] The Seventh Circuit has not provided a definition of an "indispensable" party intervening under Rule 24(a)(2). Some courts have analyzed whether an intervening party is indispensable by looking to the four-factor balancing standard under Rule 19(b), which covers joinder. *See Woodring v. Culbertson*, 227 F.R.D. 290, 294 (N.D. Ind. 2005) (citing *United States v. Tribal Dev. Corp.*, 100 F.3d 476, 478–79 (7th Cir. 1996)). The Court need not address the issue here. All parties agree that Daniel Schuld is indispensable.

*Motorists Ins. Co. v. Trane Co.*, 657 F.2d 146, 149 (7th Cir. 1981)); *see also Martin v. Glob. Experience Specialists, Inc.*, 2014 WL 2598788, at *3 (N.D. Ill. 2014). Diversity between a plaintiff and a defendant "is not necessarily settled by the plaintiff's choice of caption – courts can look beyond the pleadings and realign the parties to conform to their true interests in the litigation (at the time the action commenced)." *See Zepeda v. Atl. Specialty Ins. Co.*, 2020 WL 6747021, at *2 (N.D. Ill. 2020); *see also Am. Motorists*, 657 F.2d at 149 ("'Diversity jurisdiction cannot be conferred upon the federal courts by the parties' own determination of who are plaintiffs and who defendants.'") (quoting *City of Indianapolis v. Chase Nat'l Bank*, 314 U.S. 63, 69 (1941)).

The Court may realign parties if their true interests clash, meaning that there is an actual and substantial controversy between the parties. *See Truck Ins. Exch. v. Ashland Oil, Inc.*, 951 F.2d 787, 788 (7th Cir. 1992) ("[W]e must consider whether the parties are properly aligned – that is, whether the plaintiff and the defendants are the real adversaries."). A court must realign parties even if it "may destroy diversity and deprive the court of jurisdiction." *See Am. Motorists*, 657 F.2d at 149. A court may see a dispute for what it really is, and may consider – from a real-world perspective – who is against whom.

Here, all parties agree that Donna Schuld and Daniel Schuld have conflicting interests, and that Daniel Schuld is effectively a defendant in Donna Schuld's complaint. *See* Defs.' Mtn. to Dismiss, at 4 (Dckt. No. 24); Third-Party Intervenor's Resp. to Defs.' Mtn. to Dismiss, at 4 (Dckt. No. 40); Pl.'s Resp. to Defs.' Mtn. to Dismiss (Dckt. No. 44). Donna Schuld and Daniel Schuld each claim a right to the proceeds of the note. They have competing interests in the same asset.

The Court aligns Daniel Schuld as a defendant in relation to Donna's complaint. That alignment has important implications for diversity jurisdiction. If Donna and Daniel are adverse (and they are), then they cannot be from the same state. If they're *adverse*, they have to be *diverse*.

## III.     Domicile of Richard Schuld

The last question is the main event. The parties disagree about where Richard Schuld was domiciled at the time of his death.

Donna Schuld (his wife) and Daniel Schuld (his son) argue that Richard was domiciled in Florida. But Peggy and John Thodos argue that Richard was domiciled in Illinois. If he was domiciled in Florida, then there is diversity jurisdiction. But if he was domiciled in Illinois, there isn't.

As a preliminary matter, Daniel Schuld's citizenship (as executor and trustee) depends on Richard Schuld's citizenship. *See Hunter v. Amin*, 583 F.3d 486, 491 (7th Cir. 2009) ("[T]he federal diversity statute treats the legal representative of a decedent's estate (or the estate of an infant or an incompetent) as a citizen of the same state as the decedent.") (cleaned up); *Mathur v. Hosp. Props. Tr.*, 2014 WL 6980252, at *2 (N.D. Ill. 2014) ("A trust's citizenship is determined by that of its trustee.") (citation omitted). The question is the decedent's domicile on the day of his death. *See Hunter*, 583 F.3d at 491; *Schnakenburg v. Krilich*, 2021 WL 5564874, at *2 (N.D. Ill. 2021) ("So the question [for diversity] is not where Robert Krilich held his assets (or some of his assets), but where he was a citizen when he passed away."). The executor steps into the decedent's shoes.

For diversity purposes, "it has long been established that natural persons are typically a citizen of the state in which they reside or – to be more precise – are 'domiciled.'" *See Page v.*

11

*Democratic Nat'l Comm.*, 2 F.4th 630, 634 (7th Cir. 2021); *see also Am.'s Best Inns, Inc. v. Best Inns of Abilene, L.P.*, 980 F.2d 1072, 1074 (7th Cir. 1992) ("In federal law citizenship means domicile, not residence."). A person's domicile relies on two factors: (1) physical presence; and (2) intent to remain. *See Salem v. Egan*, 803 F. App'x 928, 931 (7th Cir. 2020); *Sheneman v. Jones*, 682 F. App'x 498, 499 (7th Cir. 2017). Both elements are required. A court cannot establish a party's domicile without finding both. *See Heinen v. Northrop Grumman Corp.*, 671 F.3d 669, 670 (7th Cir. 2012) (noting that allegations of residence alone are insufficient to establish domicile); *Denlinger v. Brennan*, 87 F.3d 214, 216 (7th Cir. 1996) (noting that intent without physical presence is insufficient to establish domicile).

Domicile "means the place where a person intends to live in the long run." *RTP LLC v. ORIX Real Est. Cap., Inc.*, 827 F.3d 689, 692 (7th Cir. 2016). It is the state that an individual "considers his permanent home." *Galva Foundry Co. v. Heiden*, 924 F.2d 729, 730 (7th Cir. 1991). A person has only one domicile, and it isn't necessarily where that person might reside. *See Salem*, 803 F. App'x at 931 ("'[O]ne can reside in one place but be domiciled in another.'") (alteration in original) (quoting *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989)); *see also Page*, 2 F.4th at 635; *Shea v. Koehler*, 2019 WL 7708931, at *4 (N.D. Ill. 2019). Someone can reside in Indiana, work in Illinois, vacation in Michigan, and own property in California. But there is only one domicile.

"[I]n this age of second homes and speedy transportation, picking out a single state to be an individual's domicile can be a difficult," fact-intensive inquiry. *See Galva*, 924 F.2d at 730. Indeed, "[i]n situations where an individual has multiple residences in different states, the test can turn into a complex inquiry into an individual's intent." *Wat Buddha-Dhamma, N.F.P. v. Stang*, 2010 WL 3210586, at *4 (N.D. Ill. 2010) (Dow, J.) (citing *Galva*, 924 F.2d at 730).

Relevant factors include "living at the same address for many years, having in [that] state a driver's license, a job, and/or a registered vehicle, and receiving medical care" in that state. *See Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 733 (7th Cir. 2017). Other factors include the presence of family, and the location of real property and personal belongings. Additional factors matter, too, such as where the person carried out his everyday life, including where he exercised political rights, conducted his business and financial matters, paid taxes, and participated in the surrounding community (meaning his social clubs, religious memberships, and the like). *See Craig v. Ontario Corp.*, 543 F.3d 872, 876 (7th Cir. 2008); 13E Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3612 (3d ed. 2021) (listing factors); *see also Page*, 2 F.4th at 634–45 (citing Wright & Miller for "explaining with great clarity how federal courts determine a person's domicile for purposes of jurisdictional citizenship").

In short, a person's "entire course of conduct may be taken into account" when a court looks at his domicile. *See Kemph v. Mica Creek-Sagamore Cap. Partners*, 2014 WL 4701173, at *2 (N.D. Ill. 2014) (citing *Perry v. Pogemiller*, 16 F.3d 138, 140 (7th Cir. 1993)). No single factor is dispositive. *See Galva*, 924 F.2d at 730. And once a person has laid down stakes and established a domicile in one state, it will continue until he acquires another. *See Perez v. K & B Trans., Inc.*, 967 F.3d 651, 655 (7th Cir. 2020).

Donna brought this case to federal court, so she has the burden to prove by a preponderance of evidence that Richard was domiciled in Florida. *See Salem*, 803 F. App'x at 931 ("As the proponent of federal jurisdiction, it is Salem's burden to establish, by a preponderance of the evidence, that jurisdiction exists."); *Muscarello v. Ogle Cnty. Bd. of Comm'rs*, 610 F.3d 416, 425 (7th Cir. 2010) ("It is well established that the burden of

13

establishing proper federal subject-matter jurisdiction rests on the party asserting it – here, the plaintiff.").

This Court must resolve a factual dispute about the diversity of citizenship. *See Silha*, 807 F.3d at 173. Based on the evidence in the record, the Court concludes that Richard Schuld was domiciled in Illinois on the day of his passing.

The Court sees minimal utility in conducting an evidentiary hearing. *Cf. Dancel v. Groupon, Inc.*, 949 F.3d 999, 1003 (7th Cir. 2019) ("The district court saw no reason to conduct an evidentiary hearing to peer beyond Groupon's allegations and Dancel's concession (which was well supported by Groupon's evidence anyway), and neither do we."). Richard is deceased, and the Court instructed Defendants to file supplemental material on Richard's domicile at the time of his death. *See* 8/9/21 Order (Dckt. No. 30); Defs.' Supp. Authority (Dckt. No. 33). The Court also invited additional submissions and ordered all parties to answer a list of detailed questions about Richard's domicile in 2018. *See* 3/15/22 Order (Dckt. No. 80); Pl.'s Resp. to Request (Dckt. No. 84); Defs.' Resp. to Request (Dckt. No. 85); Third Party Intervenor Resp. to Request (Dckt. No. 86).

Richard had longstanding connections to Illinois. He was born in the state. *See* Death Certificate (Dckt. No. 33-1, at 2 of 17). He obtained an Illinois driver's license in 1985, which he held for 33 years until his death. *See* Exhibit B (Dckt. No. 33-1, at 4 of 17). He resided at the same address in Inverness, Illinois for 21 years, from 1997 to 2018. *See* Death Certificate (Dckt. No. 33-1, at 2 of 17); Pl.'s Resp. to Request, at 1–2 (Dckt. No. 84). And Richard was registered to vote in Illinois for 21 years. *See* Certification of Registration (Dckt. No. 331-1, at 6 of 17); Cancellation of Registration (Dckt. No. 40, at 16 of 32).

14

While he lived in Illinois, Richard engaged with his surrounding community. He was a member of a car club and Kiwanis Club of Illinois. *See* John Thodos Dec., at ¶¶ 6, 8 (Dckt. No. 85, at 17 of 21), Obituary (Dckt. No. 85, at 7 of 21). He was associated with a local church. *See* John Thodos Dec., at ¶ 9. He lived with his wife, Donna Schuld, at the Inverness residence for more than two decades. *See* Pl.'s Resp. to Request, at 1 (Dckt. No. 84).

Richard died in Illinois and was buried in Illinois in December 2018. *See* Death Certificate (Dckt. No. 33-1, at 2 of 17). His obituary, which Donna and Daniel Schuld helped write, stated that he was "of Inverness, IL." *See* Obituary (Dckt. No. 85, at 7 of 21); John Thodos Dec., at ¶ 12 (Dckt. No. 85, at 18 of 21). And his original death certificate stated that Richard's Illinois address was his "home." *See* Death Certificate.

So Richard Schuld had roots in the Prairie State – deep roots. He spent decades in Illinois, and he was in his eighties when he died. The question is whether Richard uprooted himself in the final three months of his life.

According to Donna and Daniel Schuld, Richard changed his domicile from Illinois to Florida in October 2018, meaning two months before he died in December 2018. *See* Pl.'s Resp. to Request, at 1 (Dckt. No. 84); Third-Party Intervenor Resp. to Request, at 2 (Dckt. No. 86). They point to three pieces of evidence.

First, Richard purchased a home in Naples, Florida in June 2018. *See* Warranty Deed (Dckt. No. 86, at 24 of 26); Settlement Statement (Dckt. No. 62, at 10 of 21). Second, Richard waived his Illinois "Homeowner Exemption" for the 2018 tax year in September 2018. *See* Homeowner Exemption Waiver (Dckt. No. 40, at 18 of 32). Third, Richard cancelled his Illinois voter registration in September 2018, explaining that he had "changed" his residency to Florida and would "concurrently register to vote" in Florida. *See* Cancellation of Voter Registration of

Richard P. Schuld (Dckt. No. 86, at 19 of 26). But Richard did not register to vote in Florida before his death. *See* Florida Letter (Dckt. No. 85, at 14 of 21).

Based on those three facts, Daniel Schuld submitted a request to the Illinois Department of Public Health to change Richard's Schuld residence on his death certificate. *See* Correction Request (Dckt. No. 86, at 10–17). Daniel submitted his request in April 2021, more than two years after Richard's death. *Id.* The Illinois Department of Public Health accepted Daniel's change that same month, modifying Richard's death certificate. It changed "Place of Death: Decedent's Home" to "Place of Death: Decedent's 2nd Home," and it now lists the Florida home as Richard's residence. *See* Am. Death Certificate (Dckt. No. 40, at 7 of 32).

According to Donna and Daniel Schuld, Richard decided in the fall of 2018 that Illinois was no longer his permanent home. He intended on living in Florida "in the long run." *See RTP LLC*, 827 F.3d at 692. Daniel Schuld argues that Richard officially changed his domicile when he mailed his Homeowner Exception waiver and Illinois voting registration form in October 2018. *See* Third Party Intervenor Resp. to Request, at 2 (Dckt. No. 86).

Donna and Daniel Schuld do point to a few facts that support ties to Florida. But on balance, the record tips decidedly in favor of the conclusion that Richard was domiciled in Illinois.

Richard's purchase of a second home does not show a change in his domicile. While his Florida residence adds a little something, the Seventh Circuit has cautioned against giving a second home undue influence in determining domicile. *See Miller v. Fryzel*, 499 F. App'x 601, 603 (7th Cir. 2013) ("A second home in another state is not unusual, and courts should be cautious about inferring that someone has abandoned a domicile of many years simply by residing in another state for a time.").

16

Richard Schuld's actions closely resemble the facts in *Galva Foundry Co. v. Heiden*, 924 F.2d 729 (7th Cir. 1991). There, the Seventh Circuit held that the defendant remained a citizen of Illinois despite taking steps to change his residence to Florida. *Id.* at 730.

In *Galva*, the defendant lived and worked in Illinois "all his life until the events giving rise to th[e] suit." *Id.* He maintained his home in Illinois, as well as memberships in a country club and church. *Id.* But the defendant owned a second home in Florida, which he and his wife used as a vacation home. *Id.* He spent several months at a time in Florida, dividing the rest of the year between Illinois and Europe. *Id.* And after he retired, the defendant "registered to vote in Florida, . . . [took] out a Florida driver's license, . . . stated in an application for a Florida tax exemption that he had become (as of that year) a permanent resident of Florida, and . . . listed his Florida address as his permanent address on both his federal and Illinois income tax returns." *Id.*

Nonetheless, the Seventh Circuit concluded that the defendants acted for tax-related reasons – Illinois taxes were higher than Florida taxes – and did not suffice to change his domicile. *Id.* Rather, the Court of Appeals found that the defendant, who maintained his Illinois household and continued participating in the social and religious life of his Illinois community, "intended no change in the manner or style of his life, the center of gravity of which was and remains in" Illinois. *Id.* In reaching its conclusion, the Seventh Circuit considered the primary rationale for federal diversity jurisdiction, which is to "protect nonresidents from the possible prejudice that they might encounter in local courts." *Id.* This rationale supported a finding that the defendant was a citizen of Illinois, as he was a "long-time resident of Illinois and unlikely therefore to encounter hostility in its state courts." *Id.*

Many of the considerations in *Galva* equally apply to Richard Schuld. While Richard's behavior may not have the same "aura of fraud" found in *Galva* (*i.e.*, Richard's desire to live in

17

Florida may not have been entirely based on tax reasons), he did not relocate his "center of gravity" to Florida. *Id.*

Richard Schuld's life remained centered around his home in Illinois in December 2018. He mailed his requests to waive his Illinois homestead exemption and deregister as an Illinois voter *from Illinois*. *See* Mail Receipts (Dckt. No. 86, at 8 of 26); John Thodos Dec., at ¶ 19 (Dckt. No. 85, at 18 of 21). In 2018, he spent close to six months in Illinois, including the month of December, when he passed away. *See* Pl.'s Resp. to Request, at 2 (Dckt. No. 84). In contrast, he spent a little more than two months in Florida. *Id.*

In addition, members of Richard's family remain in Illinois. While Richard and Donna vacationed in Florida together between 2016 and 2018, Donna never considered their Illinois residence her "second home," and she did not change her domicile to Florida before Richard's death. *See* Pl.'s Resp. to Request, at 2 (Dckt. No. 84). After his passing, Donna still lives in the Inverness house and is domiciled in Illinois. *Id.* And at least one son, Daniel Schuld, owns a nearby home. *See* Probate Petition, at ¶¶ 8–9 (Dckt. No. 33-1, at 14 of 17).

While the domicile of one's spouse is not dispositive, many courts find that this factor carries significant weight. *See e.g.*, *Kemph*, 2014 WL 4701173, at *3 (observing that the wife's domicile in Illinois suggests that the husband's "center of gravity is in Illinois"); *24 Hour Fitness USA, Inc. v. Bally Total Fitness Holding Corp.*, 2008 WL 4671748, at *4 (N.D. Ill. 2008) ("Central to this 'center of gravity' analysis is the location of an individual's family-particularly his spouse and children.") (collecting cases).

Richard and Donna were not an estranged couple. Richard's obituary describes him as the "[b]eloved husband of Donna." *See* Obituary (Dckt. No. 85, at 7 of 21). The couple clearly enjoyed their time in Florida together, so much so that Richard purchased a second home. But

18

Donna's reluctance to call Florida her "permanent home," and her insistence that she remains domiciled in Illinois, suggests that Richard remained closely and intimately connected with his life in Illinois up to his death.

Finally, Richard's long life in Illinois, along with his connections to the surrounding community, strongly weighs against finding that he changed domicile in his final months. *See Perez*, 967 F.3d at 655 ("'A domicile once acquired is presumed to continue until it is shown to have been changed. Where a change of domicile is alleged the burden of proving it rests upon the person making the allegation.'") (citation omitted); *Ziskind v. Fox*, 2010 WL 3516117, at *3 (N.D. Ill. 2010) ("Courts have created a presumption favoring an individual's old, established domicile over a newly-acquired one."); *Antelis v. Freeman*, 2011 WL 6009609, at *12 (N.D. Ill. 2011) ("Defendant's long term residency in Illinois weighs against maintaining this lawsuit under the diversity jurisdiction."); *24 Hour Fitness USA, Inc.*, 2008 WL 4671748, at *3 (collecting cases).

The Court cannot conclude that Richard changed his permanent home, of at least two decades, simply by waiving a homestead tax exemption and unregistering his Illinois voter status. They add something to the mix, but they do not outweigh the concrete ties to Illinois.

In sum, based on a preponderance of the evidence, Richard Schuld was domiciled in Illinois at the time of his death. So Daniel Schuld, as executor and trustee of Richard Schuld's estate and trust, is a citizen of Illinois. Daniel Schuld is adverse to Donna Schuld because they have competing claims to the proceeds of the promissory note. They're adverse, but they're not diverse, so there is no subject matter jurisdiction.

**Conclusion**

For the reasons stated above, the Court grants Defendants' motion to dismiss for lack of subject matter jurisdiction.

Date: March 25, 2022

Steven C. Seeger
United States District Judge